# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SARABETH MONA CANTER, | ) | 3:19-CV-00157 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW SAUL, Commissioner of the | ) | |
| Social Security Administration,[1] | ) | |
| *Defendant*. | ) | FEBRUARY 24, 2020 |

## MEMORANDUM OF DECISION

Kari A. Dooley, United States District Judge

Plaintiff Sarabeth Mona Canter ("the Plaintiff") brings this administrative appeal pursuant to 42 U.S.C. § 405(g). She appeals the decision of defendant Andrew Saul, Commissioner of the Social Security Administration, (the "Commissioner") denying her applications for disability and disability insurance ("DIB") pursuant to Title II of the Social Security Act (the "Act") and supplemental security income ("SSI") benefits pursuant to Title XVI of the Act. The Plaintiff moves to reverse the Commissioner's decision, or in the alternative a remand of this matter back to the Commissioner, because the administrative law judge (1) failed to develop the administrative record, (2) failed to apply the treating physician rule, (3) conducted a faulty analysis when determining whether there are a significant number of jobs in the national economy that she could perform, and (4) failed to properly consider certain non-severe impairments when determining her residual functional capacity. The Commissioner opposes each of these claims of error and moves for an order affirming its decision. For the reasons set forth below, the Plaintiff's Motion to Reverse is DENIED and the Commissioner's Motion to Affirm is GRANTED.

---

[1] The Plaintiff commenced this action against Nancy A. Berryhill as the Acting Commissioner of Social Security on February 1, 2019. Andrew M. Saul subsequently became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner Saul is automatically substituted for Nancy A. Berryhill as the named defendant. The Clerk of the Court is directed to amend the caption in this case accordingly.

**Standard of Review**

It is well-settled that a district court will reverse the decision of the Commissioner only when it is based upon legal error or when it is not supported by substantial evidence in the record. *See Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). The court does not inquire as to whether the record might also support the plaintiff's claims but only whether there is substantial evidence to support the Commissioner's decision. *Bonet ex rel. T.B. v. Colvin,* 523 Fed. Appx. 58, 59 (2d Cir. 2013). Substantial evidence can support the Commissioner's findings even if there is the potential for drawing more than one conclusion from the record. *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). The court can reject the Commissioner's findings of facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin.* 683 F.3d 443, 448 (2d Cir. 2012). Stated simply, "if there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013).

**Procedural History**

The Plaintiff filed an application for DIB benefits on August 25, 2014 and an application for SSI benefits on August 31, 2014.[2] Both applications alleged an onset date of January 1, 2006. The Plaintiff's last date insured for purposes of her DIB application was December 31, 2006. The

---

[2] The regulations for disability and disability insurance and supplemental security income benefits are virtually identical. The DIB regulations are found at 20 C.F.R. § 404.900, *et seq.*, while the parallel SSI regulations are found at 20 C.F.R. § 416.901, *et seq.*

applications were denied initially on December 9, 2014 and upon reconsideration on October 1, 2015. Thereafter, a hearing was held before an administrative law judge ("ALJ") on November 9, 2017. On February 28, 2018, the ALJ issued a written decision denying the Plaintiff's applications.

In his decision, the ALJ followed the sequential evaluation process for assessing disability claims.[3] At Step 1, the ALJ found that the Plaintiff has not been engaged in substantial gainful activity since January 1, 2006. At Step 2, the ALJ determined that the Plaintiff had two severe impairments during the period relevant to the DIB application: substance abuse disorder and personality disorder. For purposes of the SSI application, the ALJ determined that the Plaintiff had a third severe impairment: bronchitis with bronchospasm. At Step 2, the ALJ also found that the Plaintiff had several non-severe impairments: anxiety disorder, post-traumatic stress disorder, depression, a heart murmur, headaches, a seizure disorder, and obesity.

At Step 3, the ALJ concluded that the combination of the Plaintiff's substance abuse and personality disorders met Listing 12.08. As required by the applicable regulations, the ALJ next considered the severity of the Plaintiff's impairments in the absence of the substance abuse disorder.[4] The ALJ concluded that the Plaintiff would not have any severe mental impairments in

_____

[3] Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities; (3) if such a "severe impairment" is established, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity to perform her past work; (5) if the claimant is unable to perform her past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform. 20 C.F.R. 404.1520(a)(4)(i)-(v). The claimant bears the burden of proof with respect to Step 1 through Step 4, while the Commissioner bears the burden of proof as to Step 5. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

[4] If an ALJ has "evidence of [a claimant's] drug addiction or alcoholism," it "must determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a); 20 C.F.R. § 416.935(a). If the addiction is a such a contributing factor material to the determination that he or she is disabled, the claimant is not disabled. *E.g.*, *Smith v. Comm'r of Soc. Sec. Admin.*, 731 Fed. Appx. 28, 30 (2d Cir. 2018) (summary order) (holding ALJ did not err in conclusion that claimant was not disabled where her substance use was a contributing factor material to the determination that she was disabled).

the absence of substance abuse, but he concluded that her bronchitis with bronchospasm was severe as of January of 2015. The ALJ further concluded that none of the Plaintiff's impairments would meet or medically equal the Listings in the absence of substance abuse.

At Step 4, the ALJ concluded that the Plaintiff would have the residual functional capacity ("RFC") to perform work at any exertional level, subject to certain limitations related to the respiratory impairment, if she stopped her substance abuse. The ALJ found for purposes of the DIB application that the Plaintiff could return to her past relevant work as an administrative assistant, but he concluded that her past relevant work was too remote for purposes of the SSD application. Accordingly, the ALJ proceeded to Step 5 where he concluded that there are a significant number of jobs in the national economy that the Plaintiff could perform and, therefore, she was not disabled within the meaning of the Act. This appeal followed.

**Discussion**

### Mental Functional Capacity Assessment

Clear from the record is that the Plaintiff has a lengthy history of polysubstance abuse which pre-dates the alleged onset date. The Plaintiff began using alcohol at the age of 13, cannabis at the age of 16, cocaine at the age of 20, heroin at the age of 26, and benzodiazepines at the age of 38. The Plaintiff, however, has also enjoyed extended periods of sobriety.

From 1982 through 1991, while still abusing substances, the Plaintiff was employed at various temporary jobs. In 1991, the Plaintiff regained sobriety. From 1991 through 2001, the Plaintiff was employed as an administrative assistant until she was let go due to downsizing at the facility where she worked.[5] Thereafter, in 2002, the Plaintiff relapsed. During the calendar year 2006, the period relevant to the DIB application, the Plaintiff, by her own admission, was in the

---

[5] The record contains varying descriptions by the Plaintiff of how long she held this position and when she was downsized. The 1991 to 2001 timeframe appears to be most accurate and is consistent with her hearing testimony.

throes of addiction. Although Plaintiff testified that her "sobriety date" was November of 2013, she also testified that she smoked crack cocaine until 2014 and her medical records reflect active use of cocaine and benzodiazepine through at least January 22, 2015.

As noted above, the ALJ determined that, in the absence of substance abuse, the Plaintiff's impairments were not severe and did not meet the Listing 12.08 criteria. The Plaintiff argues that the ALJ's assessment in this regard was flawed because he did not have treatment records or a complete medical source statement from her treating psychiatrist, Dr. Barbara Orrok.[6] In advancing this argument, the Plaintiff contends that the ALJ failed to develop the administrative record and violated the treating physician rule. The Court will address each argument in turn.

The following additional facts are relevant to these claims. The Plaintiff began receiving mental health treatment from Dr. Orrok in April of 2006, and she continued to receive treatment throughout the period relevant to this appeal. Prior to the hearing, the Plaintiff requested that Dr. Orrok provide copies of her medical records for the period January 1, 2015 through July 20, 2017 (the date of the request). Despite being assured that the records had been prepared and were ready for dispatch, the Plaintiff did not receive them prior to the hearing. Plaintiff's counsel explained this to the ALJ, who agreed to leave the record open for three weeks so that the Plaintiff could submit those records. At the hearing, the ALJ further noted that the mental impairment

---

[6] The Plaintiff also argues that the ALJ erred by not securing a medical source opinion or a function-by-function assessment from Dr. Allan J. Rodriguez or Dr. Louis Telesford. The record before the ALJ reflected that Dr. Rodrigues treated the Plaintiff for pneumonia in 2015. It further reflected that Dr. Telesford treated the Plaintiff on six occasions between April of 2017 and July of 2017 for a cough, gastro-intestinal complaints, diabetes training, a referral to a gynecologist, and laboratory work. It is readily apparent that neither of these physicians could have provided any insight into the Plaintiff's functionality in 2006, the period relevant for the DIB application. It further remains unclear why a medical source opinion from either of these physicians was necessary for the ALJ's evaluation of the Plaintiff's eligibility for SSA benefits. The ALJ had before him both physician's medical records which contained their assessment of the Plaintiff's relevant medical condition, and a disability report from a consulting physician. Accordingly, the Court is not persuaded that the ALJ failed to develop the record in this regard. *See Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.").

questionnaire submitted by the Plaintiff was missing a signature page and, therefore, the date and authorship were uncertain. Plaintiff's counsel stated that the form had been completed by someone at Jewish Family Services and that he would obtain a completed form for the ALJ.

Subsequently, the Plaintiff obtained medical records from Dr. Orrok for the period of January 24, 2017 to November 28, 2017. The Plaintiff provided these records to the ALJ. Jewish Family Services informed plaintiff's counsel, however, that nobody at their offices had completed the mental impairment questionnaire, and they suggested that it had to have been completed by Dr. Orrok. Because of the "extreme difficulties" plaintiff's counsel was encountering in getting Dr. Orrok to respond to any of his requests, he asked the ALJ to communicate with Dr. Orrok directly to determine whether she was the author of the questionnaire and, if so, when it was completed. (R. 587.)[7] The ALJ denied this request because there was no indication that the questionnaire was completed by Dr. Orrok, who was referred to in the questionnaire in the third person. In his decision, the ALJ afforded no weight to the mental impairment questionnaire because it was unsigned and undated.

On July 18, 2018, plaintiff's counsel wrote a letter to the Appeals Council to inform it that he would be submitting additional records from Dr. Orrok. He explained that "Dr. Orrok, as is her habit, had refused repeated requests for copies of her records." (R. 589.) He explained that the Plaintiff was ultimately able to obtain copies of those records by going to Dr. Orrok's office in person. The supplemental records included Dr. Orrok's progress notes from September 6, 2016 to October 31, 2017 and a copy of the mental impairment questionnaire that was signed by Dr. Orrok on the third page, but still missing the last page. The Appeals Council concluded that there was not a reasonable probability that these records would change the outcome of the ALJ's decision.

---

[7] Citations to the record; (ECF No. 11); are identified as (R. __).

*Development of the Administrative Record*

The Plaintiff's first argues that the ALJ erred by not taking any steps to obtain a complete medical source statement from Dr. Orrok and by failing to issue a subpoena for Dr. Orrok's records dating back to 2006.[8] The Commissioner responds that there was no need to obtain a medical source statement from Dr. Orrok because there was sufficient evidence in the record for the ALJ to determine the Plaintiff's mental functional capacity in the absence of substance abuse. The Commissioner further responds that the ALJ was under no obligation to issue the subpoena requested. The Court agrees with the Commissioner.

Although the claimant has the general burden of proving that he or she has a disability within the meaning of the Social Security Act, "the ALJ generally has an affirmative obligation to develop the administrative record" due to the non-adversarial nature of a hearing on disability benefits. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted; internal quotation marks omitted). There is no obligation, however, to re-contact a treating physician where the evidence of record is "adequate to permit the ALJ to make a disability determination." *Carvey v. Astrue*, 380 Fed. Appx. 50, 53 (2d Cir. 2010) (summary order); *see Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996). To the extent that the record is insufficient or inconsistent, the Commissioner "will determine the best way to resolve the inconsistency or insufficiency." 20 C.F.R. § 404.1520b(c) (2012); 20 C.F.R. § 416.920b(c) (2012). The Commissioner "may recontact [the claimant's] treating physician," or it can take other steps, such as "ask[ing] [the claimant] to undergo a consultative examination" or ask "others for more information." 20 C.F.R. § 404.1520b(c)(1), (3), (4) (2012); 20 C.F.R. § 416.920b(c)(1), (3), (4) (2012). Whether to issue a

---

[8] Based on the record, it does not appear that the Plaintiff ever asked Dr. Orrok to produce records from prior to January 1, 2015. In support of her request for a subpoena, the Plaintiff attached her letter to Dr. Orrok which limited her request to records after January 1, 2015. The HIPPA release in Dr. Orrok's subsequently produced records is similarly limited to records after January 1, 2015.

subpoena duces tecum is a matter within the discretion of the ALJ. 20 C.F.R. § 404.950(d)(1) (2013); 20 C.F.R. § 416.1450(d)(1) (2013); *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (concluding that regulations "clearly place[] the decision to issue a subpoena within the sound discretion of the ALJ").

Accordingly, "it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, No. 13-cv-06303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. 2015). In cases in which the claimant has a history of substance abuse, in particular, the Second Circuit has held that the Commissioner can find that drug or alcohol use is a contributing factor supporting denial of benefits even where there is no medical opinion addressing this specific issue. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 126 (2d Cir. 2012); *e.g.*, *Wettlaufer v. Colvin*, 203 F. Supp. 3d 266, 277–78 (W.D.N.Y. 2016) (rejecting argument that Commissioner's decision should be reversed because there was no medical opinion addressing her alcohol abuse). Remand is also not required if "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 29, 34 (2d Cir. 2013) (summary order); *Decava v. Berryhill*, No. 3:17-cv-01834 (MPS), 2019 WL 186656, at *2 (D. Conn. Jan. 14, 2019).

After reviewing the record, the Court is persuaded that the record was sufficient for the ALJ to determine the Plaintiff's functionality in the absence of substance abuse and, relatedly, whether the Plaintiff's substance abuse was a contributing factor material to the determination of disability. The ALJ had before him the Plaintiff's medical records (including some of Dr. Orrok's treatment notes), a consultative psychological examination, the Plaintiff's statements in her questionnaires and at the hearing, and the testimony of a medical expert, Dr. Alfred Jonas. This

record revealed the following information concerning the Plaintiff's mental functionality in the absence of substance abuse.

During a period of prolonged sobriety in the 1990s, the Plaintiff was able to sustain the same job for over a decade until she was "downsized" when the facility that she worked at was shut down. Thereafter, the Plaintiff relapsed, reengaging in substance abuse. To her credit, the Plaintiff candidly admitted at the hearing that she was unable to work in 2006 because she was "strung out on drugs, homeless and had no transportation and was a mess." (R. 260.) She testified as to the harsh toll "shooting drugs" during that period had on her body as well as her ability to remember, concentrate, and engage in conversation. (R. 263.)

The Plaintiff, who appeared to be in a period of sobriety by the time of the hearing, also testified about her current daily living activities. The Plaintiff stated that she lived with and cared for her elderly mother. She helps her mother dress and clean herself. She is the only one who does household chores and shops for groceries. She also does laundry, takes out the trash, and makes meals. She regularly attends doctor appointments and drives approximately five days per week to stores, the library, and pharmacy. The Plaintiff also traveled to Las Vegas in 2016 with friends and her mother, and she assisted her mother when she was hospitalized with pneumonia for three weeks during that trip.[9] She has also been looking into volunteering with a literacy program to teach English.

In addition to having a history of substance abuse, the Plaintiff's medical records revealed a history of anxiety, depression, and personality disorders. Accordingly, the ALJ heard expert testimony from Dr. Jonas, who has over forty years of experience in the field of psychiatry and had reviewed the Plaintiff's medical records. After asking the Plaintiff a few clarifying questions,

---

[9] The Plaintiff also testified that she took a multi-country trip abroad with her mother and other friends in 2010 and traveled to France in 2012.

Dr. Jonas confirmed that he had sufficient information to form an opinion about the nature and severity of the Plaintiff's mental health impairments. Dr. Jonas opined that the Plaintiff's principal psychiatric issue in 2006 was substance abuse. Dr. Jonas further opined that, in the absence of substance abuse, the Plaintiff had the mental functional capacity to work. In rendering this opinion, Dr. Jonas acknowledged that the record reflected that the Plaintiff complained of anxiety and depression, but he explained that these disorders could not be confidently diagnosed because individuals seeking sedatives, like the Plaintiff was, usually tell doctors that they are anxious or in pain in order to obtain prescriptions for sedatives, such as opiates or benzodiazepine. As a result, he saw the Plaintiff's complaints of depression and anxiety "as being in the service of pursuing substance abuse, not as separate and independent and reliable dynamics." (R. 246.) Dr. Jonas also acknowledged that there were references in the record to the Plaintiff having a history of borderline personality disorder, but he was not persuaded that the Plaintiff had a personality disorder that, on its own, impaired her functionality because the Plaintiff was able to work as an administrative assistant for an extended period with the same company while sober.[10]

In sum, the Plaintiff's own testimony established that she is capable of sustaining prolonged employment and functioning at a high-level during periods of sobriety, notwithstanding whatever other mental impairments she might have. Significantly for purposes of the DIB application, the Plaintiff testified that the reason she could not work in 2006 was because of her substance abuse. Although the record does reveal that the Plaintiff has a history of anxiety, depression, and a personality disorder, the ALJ was not required to seek an opinion concerning these diagnoses from Dr. Orrok, and he acted well within his discretion in soliciting an opinion

---

[10] The Plaintiff suggests that had Dr. Jonas had the benefit of Dr. Orrok's subsequently produced medical records, he would have reached a contrary conclusion concerning her mental functionality in the absence of substance abuse. The Court is not persuaded. Dr. Orrok's progress notes, which pertain to only 2016 and 2017, provide little insight into the Plaintiff's mental functionality and do not otherwise undermine Dr. Jonas' opinions.

from Dr. Jonas instead. *See* 20 C.F.R. § 404.1520b(c)(4) (2012); 20 C.F.R. § 416.920b(c)(4) (2012). Ultimately, the Plaintiff's and Dr. Jonas' testimony, in conjunction with the other evidence in the record, provided sufficient information to determine the Plaintiff's eligibility for benefits and constitute substantial evidence in support of the ALJ's decision.[11]

### Treating Physician Rule

The Plaintiff next argues that the ALJ erred by assigning no weight to the mental impairment questionnaire completed by Dr. Orrok and her treating social worker, Joan Sloan. The Commissioner responds that the ALJ's decision not to consider the questionnaire was reasonable under the circumstances because he did not know who had completed it. The Commissioner further notes that the Appeals Council had the signed questionnaire before it and reasonably concluded that it would not change the outcome of the case.

"When the ALJ declines to accord controlling weight to a treating source's opinion, he must give 'good reasons' for his decision." *Mullings v. Colvin*, No. 13-cv-1705 KAM, 2014 WL 6632483, at *14 (E.D.N.Y. Nov. 21, 2014); *see Burgess*, 537 F.3d at 129–30 ("Failure to provide . . . good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." [citation omitted; internal quotation marks omitted]). The ALJ in this case provided good reason for not assigning controlling weight to the mental impairment questionnaire. The questionnaire the ALJ had before him was unsigned and undated. Although the Plaintiff suggested after the hearing that the form might have been completed by Dr. Orrok, there was no indication in the record that this was the case. To the contrary, the cover letter to the questionnaire indicated

---

[11] The Court notes that a signed mental impairment questionnaire was subsequently provided to the Appeals Council. Accordingly, even if the ALJ erred by not taking additional steps to obtain a signed questionnaire from Dr. Orrick, such error was harmless and remand is not required. *See Whitaker v. Berryhill*, No. 3:17-cv-1337 (SRU), 2018 WL 4583508, at *13 (D. Conn. Sept. 25, 2018) ("Even in the face of an oversight, the ALJ's decision may be upheld if the error was 'harmless,' that is, if other 'substantial evidence in the record' supports the ALJ's conclusions." [citation omitted]).

that it was sent to Jewish Family Services, the Plaintiff stated at the hearing that it was completed by someone at Jewish Family Services, and Dr. Orrok was referred to in the third person in the questionnaire, which tended to suggest that it was completed by someone other than Dr. Orrok. Under these circumstances, it was entirely reasonable for the ALJ to assign no weight to the questionnaire.

In any event, and as previously discussed, the signed mental impairment questionnaire was subsequently considered by the Appeals Council. The Court agrees with the Appeals Council that there was not a reasonable probability that the questionnaire would change the outcome of the ALJ's decision. In general, "[c]heck box forms are weak evidence at best, and are only marginally useful for purposes of creating a meaningful and reviewable factual record." *Galarza v. Berryhill*, No. 3:18-cv-00126 (SALM), 2019 WL 525291, at *9 (D. Conn. Feb. 11, 2019) (alterations omitted; internal quotation marks omitted); *see also Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004) ("The standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record."). The questionnaire in this case further provided no insight into the Plaintiff's mental functional capacity in the absence of substance abuse. The questionnaire was completed at a time when the Plaintiff was still actively abusing drugs, and it does not indicate whether and to what extent the Plaintiff's functional capacity in the absence of substance abuse was being considered when scoring the Plaintiff's mental functional capacity.[12] As a result, the questionnaire "does not add so much as to make the ALJ's decision contrary to the

---

[12] Looking at the questionnaire, it is also impossible to discern who completed the form because the form itself contains two very distinct types of handwriting, and it is noteworthy one set of handwriting is virtually identical to the Plaintiff's handwriting. The Court further notes that the mental impairment questionnaire states that the Plaintiff had been substance free for sixty days, which, as discussed above, was not the case based on other evidence in the record. All of this tends to undermine the reliability of the questionnaire.

weight of the evidence." *Rutkowski v. Astrue*, 368 Fed. Appx. 226, 229 (2d Cir. 2010) (summary order).

### The Testimony of the Vocational Expert

The Plaintiff next argues that the Commissioner failed to meet his burden at Step 5 because the vocational expert's source of job incidence data from U.S. Publishing Company is unreliable.[13] The Court disagrees.

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform. An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citation omitted). With respect to the testimony of vocational experts, district courts in the Second Circuit "follow the 'Seventh Circuit's approach of requiring some evidentiary basis to rely up[on] the opinions of the vocational expert.'" *Koutrakos v. Colvin*, No. 3:13-cv-01290 (JGM), 2015 WL 1190100, at *20 (D. Conn. Mar. 16, 2015) (alternations omitted) (quoting *Wages v. Comm'r of Soc. Sec.*, No. 3:11-cv-01571 (JHC), 2013 WL 3243116, at *6 (D. Conn. June 26, 2013)). "The Second Circuit has explained that substantial evidence supports a vocational expert's testimony where the vocational expert has 'identified the sources he generally consulted to determine such figures,' and that there is a 'marked absence of any applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation.'" *Seneschal v. Berryhill*, No. 3:18-cv-00015 (RMS), 2019 WL 1075606, at *4 (D.

---

[13] The Plaintiff also contends that the Commissioner's analysis at Step 5 was faulty because the hypothetical questions presented to the vocational expert included an incorrect RFC. Because the ALJ's RFC determination is supported by substantial evidence in the record, this Court rejects this claim of error.

The Court further notes that the ALJ found that the Plaintiff could perform her past relevant work for purposes of the DIB application. This claim, therefore, has no bearing on the Commissioner's decision as to that application.

Conn. Mar. 7, 2019) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 450 (2d Cir. 2012)).

Here, the Plaintiff challenges the vocational expert's reliance on a resource from U.S. Publishing Company to form her opinion. As an initial matter, "courts have noted that it is appropriate for a vocational expert to consult documents from the U.S. Publishing Company in providing their testimony regarding job availability." *Seneschal*, 2019 WL 1075606, at *5 (collecting cases); *accord Martucci v. Saul*, No. 3:18-cv-01357 (WIG), 2019 WL 2710795, at *6 (D. Conn. June 27, 2019). Moreover, the Plaintiff challenged the reliability of U.S. Publishing Company's methodology at the hearing. The vocational expert explained that she believed that U.S. Publishing Company was a reliable source for data because the statistics it reported "appear[] to be very reasonable with my experience of working in the field" and, when "look[ing] at some other resources within the community," she did not "see any large variances or anything that sticks out that looks ridiculous." (R. 300.) She further opined that U.S. Publishing Company was "consistent with itself and . . . consistent with the employment numbers that are actually out there." (*Id.*) Considering this testimony in conjunction with the vocational expert's thirteen years of experience as a vocational rehabilitation specialist and counselor with the Department of Veterans Affairs, the Court is not persuaded that the ALJ erred when he relied on the testimony of the vocational expert at Step 5. *See Martinez v. Berryhill*, No. 3:17-cv-00843 (SRU), 2019 WL 1199393, at *18 (D. Conn. Mar. 14, 2019) ("An ALJ does not err when he relies on a vocational expert's testimony that is based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available."). The vocational expert's testimony further constitutes substantial evidence in support of the ALJ's conclusions at Step 5.

**The Plaintiff's Non-Severe Impairments**

The Plaintiff also suggests that the Commissioner improperly concluded that certain impairments were non-severe, though she does not specify which impairments were incorrectly classified as non-severe. The Plaintiff cites to no evidence in the record which would contradict or undermine the ALJ's conclusion that these impairments were non-severe. The ALJ explained his reasons for the determination. In reviewing the record, the Court concludes that the determination is supported by substantial evidence.

In the alternative, the Plaintiff asserts, in purely conclusory fashion, that the ALJ failed to consider her non-severe impairments in the later stages of his analysis. The Court disagrees. The ALJ specifically noted the Plaintiff's claims regarding exertional limitations, to include her weight, but properly rejected them based upon the record evidence. For example, even though the Plaintiff testified that she gets winded when she walks, the ALJ noted that she remains a heavy smoker. The ALJ recognized the Plaintiff's migraines but noted that she did not follow through with treatment for them. He also recognized her seizure disorder, which he noted was controlled with medication. The Plaintiff's conclusory statement that the non-severe impairments "simply dropped out of the ALJ's analysis" is incorrect and unsupported by the record. (Plf.'s Br. at 23, ECF No. 23.) In addition, the Plaintiff cites to no objective evidence in the record which would preclude or even contradict the ALJ's findings in this regard.

**Conclusion**

For all the foregoing reasons, the Plaintiff's Motion to Reverse [ECF No. 15] is DENIED and the Commissioner's Motion to Affirm [ECF No. 17] is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of February 2020.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE